**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN J. HILL, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> Acting Commissioner of Social Security <br><br> Defendant. | Case No.: 1:14-cv-00353 - JLT <br><br> ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF, STEPHEN HILL |

Stephen Hill claims he is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff seeks judicial review of the decision of the administrative law judge ("ALJ") who concluded he was not disabled. Because the ALJ identified specific and legitimate reasons for rejecting the credibility of Plaintiff's subjective complaints and the vocational expert's testimony is substantial evidence to support the ALJ's decision, the action is **AFFIRMED**.

## **BACKGROUND**

Plaintiff filed a Title II application on January 13, 2009 for a period of disability beginning January 1, 2009, which was denied by the Social Security Administration on April 16, 2009 and upon reconsideration on June 5, 2009. (Doc. 8-4 at 9, Doc. 8-5 at 8). After an administrative hearing on November 8, 2010, the ALJ found the Plaintiff was not disabled. (Doc. 8-4 at 20). Plaintiff requested review of the ALJ's decision by the Appeals Council on December 7, 2010. (Doc. 8-5 at 61).

The Appeals Council remanded the matter for further proceedings and the second

administrative hearing was held on July 30, 2012. (Doc. 8-3 at 81). Again, the ALJ found Plaintiff was not disabled and issued an order denying his application for benefits on August 31, 2012. (*Id.* at 11). The Appeals Council denied Plaintiff's request for review on January 30, 2014. (*Id.* at 2). Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)

## DISABILITY BENEFITS

To be eligible for disability benefits, the Plaintiff must demonstrate they cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C §1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B). The burden of proof is on the claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to show the claimant is able to engage in substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

The Commissioner established a five-step sequential process for determining whether the claimant is disabled. 20 C.F.R. §§404.1520,416.920(a)-(f). The ALJ determines whether the Plaintiff (1) was engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.  Relevant Medical Evidence[1]**

Plaintiff consulted Dr. Raul Bugnusen on January 8, 2009 for "exacerbation of low back pain." Dr. Bugnusen found Plaintiff exhibited "tenderness in paralumbar areas" and there was an "abnormal straight leg test and mild antalgic gait." (Doc. 8-8 at 3). Dr. Bugnusen referred Plaintiff for pain management, prescribed Prednisone for his back pain and referred to Dr. Nystrom for treatment. (*Id.* at 3-4).

On April 16, 2009, Dr. K. Quint completed a physical residual functional capacity assessment. (Doc. 8-8 at 11-15). Dr. Quint noted Plaintiff's ability to push and/or pull hand or foot controls was unlimited. (*Id.* at 12.) Dr. Quint opined that Plaintiff was able to lift and/or carry 10 pounds frequently and 20 pounds occasionally, sit for about six hours in an eight-hour day, and stand and/or walk a total of about six hours in an eight-hour day. (*Id.* at 12.) Further, Plaintiff had no manipulative, communicative, or visual limitations, but was limited to performing postural activities—including climbing, balancing, kneeling, on a frequent basis, and stooping, crouching and crawling—on an

---

[1] Because Plaintiff sought disability benefits only, the ALJ was required to determine whether Plaintiff was disabled prior to the date he was last insured: December 31, 2010. *Morgan v. Sullivan*, 945 F.2d 1079, 1081 (9th Cir. 1991).

occasional basis. (*Id.* at 13-14.) Also, Dr. Quint opined Plaintiff was required to avoid concentrated exposure to heights. (*Id.* at 14).

In April and May 2009, Plaintiff visited Kern Medical Center emergency room for medication refills. (Doc. 8-8 at 45.) Plaintiff claimed he had moderate aching pain in his knee and lower back. (*Id.*) He was diagnosed with chronic back pain and uncontrolled hypertension on May 14, 2009. (*Id.* at 19.)

On June 5, 2009, Plaintiff was examined for his knee pain, and the results showed "normal knee joints, minimal degenerative joint disease with small spurs of the left and right knee." (Doc. 8-8 at 73). Plaintiff requested a new pain management doctor and was prescribed Contin for pain. (*Id.* at 32).

On July 8, 2009, Plaintiff visited the after-hours care clinic at San Joaquin Valley Pulmonary Group for knee and back pain and requested refills of Oxycontin and Dilaudid. (Doc 8-8 at 107). He returned on July 10 and 14, complaining of "persistent knee [and] back pain." (*Id.* at 104-05). On July 21, 2009, Plaintiff told Dr. Jeff Jolliff that his pain was "2 of 10" with his medication and "8 of 10" without. (*Id.* at 66). Dr. Jolliff opined Plaintiff's pain was "controlled w/ current [medication] regimen." (*Id.*)

On August 27, 2009, Plaintiff complained of spinal headaches from a motor vehicle accident. (Doc. 8-8 at 64.) Dr. Matthew Dehner indicated Plaintiff's pain was controlled with medication. (*Id.*)

On January 23, 2010, Plaintiff complained he felt "physically awful," but said his pain was "2/10." (Doc. 8-8 at 118.) Dr. Parmar diagnosed Plaintiff with lumbar facet injury and prescribed injections on each knee joint. (*Id*).

Plaintiff received lumbar facet joint injection on the right side on February 2, 2010 (Doc. 8-8 at 117) and again on March 23, 2010. (*Id*. at 116). At a follow up visit on April 1, 2010, Plaintiff reported "temporary pain relief" and said the pain was more tolerable after the procedures. (*Id.* at 114). Dr. Parmar noted that Plaintiff "requested a wheelchair due to the fact that the patient [had] limited mobility in terms of distance or ambulation due to the severe back pain." (*Id.* at 115).

On May 5, 2010, Plaintiff complained of back pain that was "6/10 in intensity." (Doc 8-8 at 112). Plaintiff again inquired about the use of a wheelchair. (*Id.*) Dr. Parmar told Plaintiff "[it] might be helpful that he has the wheelchair for distance mobility in the community." (*Id.* at 113). Dr.

4

Parmar recommended that Plaintiff have a "right and/or left lumbar facet joint injection again to relieve the back pain." (*Id.*)

On June 3 and August 26, 2010, Plaintiff indicated that he was feeling "worse" but said his pain level was a 5/10. (Doc. 8-8 at 110-11.) In January 2010, Plaintiff reported that an injection "helped pain gradually," and his pain had decreased to a 2/10. (Doc. 8-8 at 118.)

Plaintiff visited the emergency room at the Bakersfield Heart hospital on October 12, 2010 for strong retrosternal chest pain. He was discharged after his stress test was found to be negative for ischemia and his echocardiogram results were normal. (Doc 8-14 at 21, 27).

**B.     Administrative Hearing Testimony**

1.     November 8, 2010

Plaintiff testified before the ALJ at the hearing on November 8, 2010. (Doc. 8-3 at 97.) Plaintiff reported he had been disabled since January 1, 2009. (*Id.* at 102-03). He said he tried to look for work in June 2009 but was unsuccessful. (*Id.*)

Plaintiff said he lived with his wife and three children, and he watched the kids for about two hours a day. (Doc. 8-3 at 106-07). He said he had not driven for "approximately two years" due to his medications, including Dilaudid, OxyContin, and Soma. (Doc. 8-3 at 107). He testified he was fully compliant with his treatment and medications. (*Id.* at 106).

Plaintiff testified that his motorized wheelchair was prescribed by the pain management specialist Dr. Parmar in May 2009. (Doc. 8-3 at 103.) He asserted that he could walk half a block without the wheelchair and estimated he used it "[a]pproximately 80 percent of the time" around his house. (*Id.*) Plaintiff said he could stand for about 20 minutes before having to sit, and could sit for approximately an "hour and a half" before he needed to move. (*Id.* at 104.) He explained that during an eight-hour day, he elevated his feet for "about two hours." (*Id.* at 105). Plaintiff said he had limitations with bending and stooping but could do both occasionally. (*Id.*)

Plaintiff testified he was able to shower, bathe, and dress himself. (Doc. 8-3 at 108). He said he cooked approximately "once or twice a week" and prepared simple meals an average of "twice a day." (*Id.* at 109.) In addition, Plaintiff said he did chores including the laundry "approximately two times a week, emptying the trash "once a day" and grocery shopping once or twice a month. (*Id.* at 109-10).

He estimated he read "[a]bout two hours per day," helped his children with homework for "about an hour a day," watched television for about three hours per day, and used the computer twice a week for about 30 minutes each time. (*Id.* at 111-12).

Plaintiff reported he attempted suicide in 2009. (Doc. 8-3 at 114). He explained he was bipolar but was seeking help from a mental health professional. (*Id*). He said there were seven or eight days a month that he did not feel like doing anything. (*Id.* at 116). Plaintiff said his depression and bipolar disorder made it difficult to pay attention and caused mood swings. (*Id.* at 116-17.) He estimated he could focus for about "an hour or two hours sometimes." (*Id.* at 118).

Vocational expert John Chaparro testified at the hearing and identified Plaintiff's past relevant work as a "heavy truck driver," *DOT* 905.663-014.[2] (Doc. 8-3 at 121). The ALJ asked Chaparro to consider an individual "the same age, education, language, and experience and background as the claimant." (*Id.* at 122). The ALJ specified the hypothetical worker could:

> lift and carry 20 pounds occasionally, 10 pounds frequently; could stand and walk about six hours out of eight with normal breaks, sit about six hours of out of eight with normal breaks; unlimited ability to push and pull except for 20 pound/ 10 pound limit…; and frequently climb ramps and stairs, frequently balance, frequently kneel, and occasionally climb ladders, ropes and scaffolds, and occasionally stoop, crouch and crawl; avoid concentrated exposure to hazards, …and avoid concentrated exposure to heights.

(*Id.* at 122-23). Chaparro opined that such a person was unable to perform Plaintiff's past relevant work. (*Id.* at 122). However, Chaparro believed that the person could perform "light and unskilled jobs" such as a cafeteria attendant, *DOT* 311.677-010; cashier II, *DOT* 211.462-010; and fast food worker, *DOT* 311.472-010. (*Id.* at 123).

Next, the ALJ asked Chaparro to consider an individual with the characteristics described in Plaintiff's testimony. (Doc. 8-3 at 123). Specifically, Chaparro considered one who "could lift and carry 10 pounds; can stand 20 minutes at a time, walk a half a block at a time; uses a wheelchair to ambulate 80 percent of the time; lies down two hours out of eight; can occasionally bend or stoop;

---

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).

[and] can concentrate one to two hours at a time." (*Id.*) Chaparro explained that there was "no other work" for the individual in the hypothetical. (*Id.*)

### 2. July 30, 2012

Plaintiff testified at a second hearing after the matter was remanded by the Appeals Council. (Doc. 8-3 at 85). Plaintiff said he could lift a "gallon." (*Id.*) He testified that he needed a wheelchair following a stroke, but could stand "[w]ith help and a walker." (*Id.*) According to Plaintiff, he required assistance from his wife to get dressed, go to the bathroom, brush his teeth and preparing his food. (*Id.*) Plaintiff testified that he read and watched TV, tried to play with his kids, and sometimes went to the park. (*Id.*)

Vocational expert Joel Greenberg testified at the second hearing. He identified Plaintiff's past work as a roustabout, *DOT* 939.687-018 and "a connection worker [/] gang worker," *DOT* 869.684-046. (Doc. 8-3 at 88). The ALJ asked Greenberg "to consider an individual that can lift 10 pounds; can sit for six hours in an eight-hour day, [and] stand and walk two hours in an eight-hour work day or some combination in an eight-hour work day." (*Id.*) In addition, the worker could not "have contact with general public, and could have only occasional conversations with co-workers and supervisors." (*Id.*) Greenberg opined the individual would not be able to perform Plaintiff's past relevant work. (*Id.*) However, Greenberg believed the worker could perform sedentary jobs such as: final assembler, *DOT* 713.687-018; film touch up and inspector, *DOT* 726.684-050; and ampule sealer, *DOT* 559.687-014. (*Id.* at 88-89).

Plaintiff's counsel asked Greenberg whether these jobs would "allow for accommodation for an electric or manual wheelchair or use of a walker." (Doc. 8-3 at 90.) Greenberg opined, "There might be a small percentage that would, but probably not." (*Id.*) He also said that "it probably would be very difficult to be employed in those occupations." (*Id.*)

The ALJ asked Greenberg whether there were any jobs that would "allow an individual in a wheelchair to perform sedentary occupations" with "restrictions on ability to communicate verbally." (Doc. 8-3 at 91). Mr. Greenberg replied that "there might be a very, very small percentage like a bench assembly job," but a company may not make an accommodation for entry level employees. (*Id.*)

///

**C.  ALJ's Findings**

Utilizing the five step sequential evaluation process, the ALJ found Plaintiff did not engage in substantial gainful activity since. (Doc 8-3 at 16.) At the second step, the ALJ found that the plaintiff had the following severe impairments: "lumbar facet joint disease, lumbosacral radiculopathy, degenerative joint disease right knee, obesity." (*Id.*) At the third step, the ALJ asserted the Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." (*Id.* at 17). Next, the ALJ found:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: he can lift 10 pounds, sit for six hours out of an eight hour day, stand and walk for two hours out of an eight hour day, [he] cannot perform a job that requires contact with the general [public]; and is limited to occasional conversations with coworkers and supervisors.

(*Id.*at 16) With this residual functional capacity, the ALJ concluded "there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform." (*Id.* at 21).

**DISCUSSION AND ANALYSIS**

Plaintiff claims the ALJ erred in evaluating the credibility of his subjective complaints, and "failed to include the limitations outlined and testified to by the plaintiff as a result of his orthopedic pain and physical incapability's due to the consequences of his cerebrovascular accident." (Doc. 11 at 13). Plaintiff also asserts the ALJ erred by failing "to provide the vocational expert with a residual functional capacity assessment that was 'accurate, detailed, and supported by the medical record." (*Id.*) On the other hand, Defendant asserts the ALJ "provided valid reasons for finding Plaintiff not fully credible" and "properly assessed Plaintiffs residual functional capacity." (Doc. 17 at 7).

**A.  Limitations related to the cerebrovascular accident**

Plaintiff complains that when determining the RFC, the ALJ failed to consider the limitations imposed by the cerebrovascular accident. In particular, Plaintiff refers to his testimony during which he claimed he used the wheelchair 80% of the time.[3]  (Doc. 11 at 12)  Significantly, Plaintiff suffered the first cerebrovascular accident on July 24, 2011 (Doc. 8-10 at 23-24), which was nearly seven

---

[3] He refers also to the limitations about which Plaintiff testified.  However, the ALJ found Plaintiff's testimony not to be credible and this credibility determination is addressed below.

8

months after his date last insured. However, Plaintiff's relevant condition was that as of the date he was last insured: December 31, 2010. (*Morgan v. Sullivan*, 945 F.2d at1081)

Consequently, his testimony regarding the limitations "due to the cerebrovascular accident" was not relevant to the ALJ's determination of whether Plaintiff was disabled prior to December 31, 2010. See *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1461 & n.4 (9th Cir. 1995) (observing that a "long line of cases" has established that a claimant must establish disability by the date last insured, and that "'any deterioration in [his] condition subsequent to that time is, of course, irrelevant'") (quoting Waters v. Gardner, 452 F.2d 855 (9th Cir. 1971)). Thus, the fact that Plaintiff suffered one or more strokes after the date he was last insured—and that these strokes caused disabling symptoms—had no bearing on the ALJ's determination and has no bearing on the Court's determination here.

## B.  Evaluation of Plaintiff's Credibility

In evaluating the credibility, an ALJ must "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Once the claimant shows an underlying impairment, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter,* 504 F.3d at 1036. In this case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 8-3 at 20). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms were not credible." (*Id.* at 20) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony.

Factors that may be considered in the credibility analysis include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and

effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

### 1. Objective Medical Evidence

The ALJ may not discredit the claimant's testimony as to the severity of his symptoms merely because they are unsupported by objective medical evidence. *Bunnell v. Sullivan,* 947 F.2d 341, 343 (9th Cir. 1991). If an ALJ uses the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, the ALJ "must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints." *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998). In this case, the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by the Plaintiff.

Specifically, the ALJ determined "the medical findings did not support the existence of limitations greater than the listed residual functional capacity." (Doc. 8-3 at 18.) The ALJ noted that Plaintiff "had many objective studies that revealed no significant limitations." (*Id.* at 20.) For example, the ALJ noted that Plaintiff had "X-rays of the knees taken in June 2009 which revealed minimal degenerative joint disease;" his physical exam in "April 2010 revealed strength was intact in both lower extremities; his "[c]hest x-ray in July 2010 was negative;" an [e]chocardiogram in July and October 2010 revealed normal ejection fraction[;] and stress test in 2010 was negative for ischemia." (*Id.* at 20). Further, the ALJ noted:

> Objective studies after the [Date Last Insured] expired in December 2010 also revealed no significant limitations. Echocardiogram performed on June 16, 2012 was negative (Ex. 19F p.36); a CT scan of his head performed on June 14, 2012 was negative (Ex. 19F p. 61); an MRI scan of his brain performed August 23, 2011 was negative (Ex. 19F p. 79); Ex. 20F states that MRI and MRA scans of his brain were normal; and a chest x-ray performed June 14, 2012 was negative (Ex. 21F p. 50).

(*Id.*) Thus, the ALJ properly identified the medical evidence undermining Plaintiff's complaints, and the objective medical record supports the ALJ's adverse credibility determination.

### 2. Treatment Sought and Received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness,

and side effects of any medication." 20 C.F.R. § 404.1529(c). In addition, "if a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007).

Here, the ALJ found Plaintiff's "pain was treated conservatively with prescription medication and . . . [his] condition remained stable."[4] (Doc. 8-3 at 20). The ALJ noted that Plaintiff did not seek "regular treatment for his mental conditions," and the treatment records "reveal[ed] improvement in symptoms with medication." (*Id.*) Further, the ALJ observed, "progress notes in September 2009 revealed that [Plaintiff's] diabetes was in excellent control." (*Id.*) Thus, the treatment Plaintiff sought and received supports the adverse credibility determination.

### 3. Inconsistencies between Plaintiff's testimony and the record

When a claimant's testimony conflicts with the record, the inconsistencies may constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999). Here, the ALJ noted inconsistencies in Plaintiffs testimony related to his use of the wheelchair. Specifically, Plaintiff testified that Dr. Parmar prescribed the wheelchair. (Doc. 8-3 at 103). However, the ALJ noted that Plaintiff had "intact strength in his lower extremities, and Plaintiff "*requested* a prescription for a regular wheelchair, and his doctor said it *might* be useful for distance mobility." (*Id.* at 20, emphasis added; *id.* at 22). Thus, the ALJ concluded the doctor's statement indicated the wheelchair was a convenience and that Dr. Parmar impliedly rejected the necessity of any regular use of the device. Id. at 19. Given these facts, the ALJ concluded Plaintiff's wheelchair was "not necessary for getting around in a small area." (*Id.* at 20).

In addition, the ALJ noted an "initial drug screen was positive for opiates and amphetamines" (Doc. 8-3 at 20, citing Ex. 21F p.50), although Plaintiff denied drug use multiple times. (*See, e.g.,* Doc 8-8 at 32, 45; Doc 8-14 at 29, 36.) Plaintiff's lack of candor regarding his drug use diminishes his credibility. *Thomas*, 278 F.3d at 959 (upholding a credibility determination where the claimant

---

[4] Thus, the ALJ did not ignore that Plaintiff was prescribed medication to address his pain; to the contrary, the ALJ relied upon the medical records to demonstrate that the use of medication adequately addressed the pain. Notably, the Ninth Circuit has determined that impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Soc. Sec*., 439 F.3d 1001, 1006 (9th Cir. 2006).

11

"present[ed] conflicting information about her drug and alcohol use"); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("testimony by the claimant that appears less than candid" may be considered as part of the credibility determination).

Accordingly, the ALJ properly identified inconsistencies between Plaintiff's testimony and the record, which leads to an adverse credibility determination.

### 4. ALJ's observations at the hearing

An ALJ may reference personal observations of a claimant as part of an adverse credibility determination if other evidence in the record supports the decision. *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985) ("The inclusion of the ALJ's personal observations does not render the decision improper"); *Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (observations of ALJ during the hearing, along with other evidence, is substantial evidence for rejecting testimony).

The ALJ observed that during the second administrative hearing that Plaintiff had an extreme stutter making it difficult to understand what he was saying. (Doc 8-3 at 20). The ALJ believed the "stutter did not seem genuine and ...his doctors would have devoted more attention to the stutter, if it was exhibited during medical evaluations." (Doc 8-3 at 20). The fact that the ALJ believed Plaintiff's stutter was inconsistent with the medical record is a proper consideration. *See, e.g., Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (rejecting the argument that "the ALJ improperly relied on observations . . . made at the hearing," because the ALJ noted symptoms exhibited "were inconsistent with the medical evidence and with other behavior . . . exhibited at the hearing"). Further, as discussed above, the ALJ's observations were not the only basis for rejecting Plaintiff's credibility, as discussed above. Therefore, the ALJ did not err by relying, in part, upon his own observations to find Plaintiff lacked credibility. *See Nyman*, 779 F.2d at 531; *Drouin*, 966 F.2d at 1258-59.

### 5. Daily Activities

If Plaintiff "is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Fair,* 885 F.2d at 603. Thus, the Ninth Circuit has determined that an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant participates in community activities, gardens, and exercises. *Valentine v.*

*Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009); *see also Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001). Nevertheless, an ALJ must make a specific finding that the claimant's daily activities are transferable to a workplace to refute allegations of disability. *Orn*, 495 F.3d at 639.

In *Rollins*, the ALJ noted the claimant's testimony regarding her limitations was "undermined by her testimony about her daily activities, such as attending to the needs of her children, cooking, housekeeping, laundry, shopping, attending therapy." *Id.*, 261 F.3d at 857. Similarly, here, the ALJ noted Plaintiff testified that he "is able to perform some household chores, cook, do laundry, shop, use computer and help children with their homework." (Doc. 8-3 at 20). The ALJ concluded, "These broad capacities are not consistent with total disability." (*Id.*) Although the ALJ did not determine whether these activities are transferable to a workplace, the ability to perform these activities undermines Plaintiff's credibility. *See Rollins*, 261 F.3d at 857 (finding the ALJ's evaluation of the evidence was "reasonable," and the claimant's daily activities were a clear and convincing reason for discounting her testimony). Thus, the ALJ's consideration of Plaintiff's daily activities supports the adverse credibility determination.

**B.     Testimony of the Vocational Expert Supports the ALJ's decision**

An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). When eliciting testimony from the expert, the ALJ may pose "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Id.* (quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). Only limitations supported by substantial evidence must be included in the question. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel,* 240 F.3d 1157, 1163-65 (9th Cir. 2001). "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

Plaintiff argues vocational expert's testimony does not support the ALJ's decision because "the ALJ failed to include limitations outlined and testified as a result of his orthopedic pain and physical

13

incapacities due to the cerebrovascular accident." (Doc. 11 at 12). However, as set forth above, the ALJ identified clear and convincing reasons for rejecting Plaintiff's credibility regarding his pain and limitations, which were "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Moreover, the limitations imposed by the strokes which occurred months after the date Plaintiff was last insured were not relevant for purposes of determining whether he was disabled on the date last insured.

Because limitations to which Plaintiff testified were not supported by the record, the ALJ was not required to incorporate the limitations in the hypothetical given to the vocational expert. *See Gallant*, 753 F.2d at 1456. Rather, the "weight of the medical evidence supports the hypothetical questions posed by the ALJ," and as a result, the testimony of the vocational expert supports the ALJ's conclusion that Plaintiff is able to perform some sedentary and unskilled work in the national economy, including small products assembler, inspector, and hand packager. *See Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987).

## **CONCLUSION**

For the forgoing reasons, the ALJ carried his burden to articulate clear and convincing reasons for finding Plaintiff lacked credibility and rejecting his subjective complaints. Further, the ALJ's decision is supported by the testimony of the vocational expert. Because the ALJ applied the proper legal standards, his conclusion that Plaintiff is not disabled as defined by the Social Security Act during the relevant period must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Stephen Hill.

IT IS SO ORDERED.

Dated: **May 15, 2015**      **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE